* * * * * * * * * * *
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before the Deputy Commissioner and the briefs and argument of the parties. The appealing party has not shown good ground to receive further evidence or rehear the parties or their representatives. Following its review, the Full Commission affirms the Opinion and Award of the Deputy Commissioner, with certain modifications.
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. The parties are properly before the North Carolina Industrial Commission and the North Carolina Industrial Commission has jurisdiction of the parties and of the subject matter;
2. The parties are subject to and bound by the North Carolina Workers' Compensation Act (the "Act"); *Page 2 
3. The parties have been correctly designated and there are no questions as to misjoinder or non-joinder of the parties;
4. An employer-employee relationship existed between Plaintiff and Defendant-Employer at the time of the alleged injury on September 7, 2005;
5. Defendant-Employer employed more than three employees at all times relevant to this case;
6. The date of Plaintiff's alleged injury by accident is September 7, 2005; and
7. Plaintiff's average weekly wage is to be determined from an I.C. Form 22.
 * * * * * * * * * * *
Based upon the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is 38 years old and has a high school diploma. He has had some college business training, as well as safety training at various jobs for several years.
2. Plaintiff began working for Defendant-Employer in January 2005 as a lab technician. Part of his work for Defendant-Employer involved mixing chemical "baths," containing, by his example, 970 grams of water and 30 grams of certain chemicals. He or his co-workers would then perform a process referred to as "padding," wherein fabric would be placed in the bath, then run through a "padder" to ring out excess liquid. The fabric was then placed into a vented drying oven at 200 to 275 degrees Fahrenheit for three minutes and transferred to a curing oven to bake the chemicals onto the fabric. Plaintiff's job duties also involved washing and drying the fabric afterward in eight washers and dryers located in a portion of the lab away from the padding area. Plaintiff and his coworkers also recorded information about the *Page 3 
functional effects of the various chemical baths on the fabric, such as wrinkle prevention and stain guarding.
3. Plaintiff testified that prior to working for Defendant-Employer, he had not experienced or been treated for any coronary or pulmonary problems.
4. Plaintiff testified that on September 7, 2005, he was working with a combination of chemicals that he had not worked with before. He also indicated the curing oven was set to 375 degrees, a higher than normal temperature, and that he tested 91 pieces of fabric, when he usually handled 15 or 16 pieces. Plaintiff further testified that during the curing process, a puff of blue smoke emitted from the curing oven, and after breathing in that smoke, he began to experience various symptoms while performing his work, including difficulty swallowing, chest pain, palpitations, tiredness, and a headache. Plaintiff also indicated that there was no ventilation in the room where he was working.
5. According to Donald Wade Burgess, Plaintiff's supervisor, there were approximately eight employees who performed the same chemical process duties at Defendant-Employer around the time of the alleged injury. None of the other employees of Defendant-Employer complained of the type of health concerns that Plaintiff has alleged in his workers' compensation claim. The chemicals being tested or the curing oven temperature settings used on September 7, 2005, were not unusual. The wisp of smoke that came from the curing oven was not an unusual occurrence either. Even though the curing oven itself does not have a ventilation system, fans were used to circulate the air in the lab, a practice that was in place before Mr. Burgess came to work for Defendant-Employer.
6. Mr. Jeffrey Overman, the plant engineer in charge of the facility where Defendant-Employer's lab was located at the time of the alleged exposure, testified that the lab *Page 4 
had an air-conditioning system that drew in both inside and outside air depending on the temperature outside. He was unaware of any problems with the system on September 7, 2005. He reviewed his backlog of work orders and no maintenance issues with the air conditioning system had been reported during that period of time. He also found no work orders regarding any ventilation problems. He testified that he was aware that box and other fans were regularly used in Defendant-Employer's lab.
7. Mary Ann Flood, a co-worker of Plaintiff's, testified that on September 7, 2005, Mr. Burgess directed her and Plaintiff to perform the padding process on several pieces of fabric. The number of pieces of fabric, approximately 70, was not an unusual amount to be tested. Plaintiff mixed the chemical baths for the padding process. However, Ms. Flood testified that other than four initial pieces of fabrics that he padded and placed in the drying oven, Plaintiff did not participate in the process. Plaintiff had undergone surgery approximately two weeks prior and had loosened a stitch in his arm the week before. Plaintiff could not perform the padding process because of the open area on his arm. Ms. Flood testified that she did the rest of the padding process and Plaintiff was not in the curing area that evening.
8. Ms. Flood expressed "shock" at Plaintiff's allegations that he had been harmed by the chemicals during the curing process given that he had left her alone in the lab all evening. Plaintiff ran the washers and dryers that evening and spent time in an office and in the break room. Ms. Flood confirmed that fans were being used that evening to assist with ventilation in the room where the curing process was being performed.
9. Ms. Flood further testified that she did not notice a puff of blue smoke as Plaintiff described, nor did she recall smelling anything unusual that evening. Ms. Flood did acknowledge that later in the evening, she experienced a raw, scratchy feeling in her throat. *Page 5 
However, she was "100% fine" by the end of the shift. Ms. Flood and Plaintiff left work at the same time, laughing and talking like they always did. She noticed nothing unusual about Plaintiff at the end of the shift.
10. At the end of his shift, Plaintiff went home and his alleged symptoms persisted. He later started to develop a cough and felt like he was catching a bad cold. Plaintiff went to Urgent Care the next morning. Objective testing was performed, including chest x-rays, an EKG, and blood work. The EKG revealed an AV-1 block and was repeated the next day with about the same results.
11. On September 19, 2005, Plaintiff went to see Dr. Javed Masoud, an internist with a sub-specialty in cardiology. Plaintiff reported that he had stopped smoking approximately nine months earlier. Dr. Masoud was not able to elicit from Plaintiff how long he had been a smoker. Following a physical examination, Dr. Masoud assessed that Plaintiff had atypical chest pain and acute bronchitis. He noted that Plaintiff may have been exposed to dust or chemicals at his place of employment based on the history Plaintiff provided and some rhonchi (wheezing) heard on exam. Cardiac testing yielded normal results.
12. Plaintiff was last seen by Dr. Masoud on October 28, 2005, at which time he complained of hives on his neck, forehead, and ears. Dr. Masoud diagnosed allergic dermatitis and recommended medication.
13. Dr. Masoud testfied that he did not consider Plaintiff to have a diminished ability to work as of the dates of his treatment. Dr. Masoud did not relate Plaintiff's first degree AV block or his dermatitis to his work with Defendant-Employer.
14. Dr. Masoud referred Plaintiff to Dr. Sadaat Khan, a board-certified pulmonologist, who evaluated Plaintiff on October 10, 2005. Dr. Khan found no respiratory or *Page 6 
cardiovascular abnormalities. However, Dr. Khan did note that Plaintiff experienced dyspnea or shortness of breath. During his two appointments with Plaintiff, Dr. Khan was leaning towards a diagnosis of asthma. He was not conclusively able to say that this condition was related to chemicals Plaintiff came into contact with at work. During his treatment of Plaintiff, Dr. Khan did not come to an opinion that Plaintiff was unable to work. Dr. Khan explained in his deposition testimony that, even though Plaintiff complained of significant shortness of breath, the objective testing performed on September 20, 2005, indicated no significant ventilatory defects, which called into question whether Plaintiff gave a complete effort during testing.
15. On October 27, 2005, Plaintiff was examined by Dr. Eric Crespo, a board-certified internist with a specialty in cardiology. Plaintiff presented with a chief complaint of chronic chest discomfort. Dr. Crespo testified that his medical notes reflecting an impression of "recent occupational chemical exposure with subsequent development of reactive airway process" did not indicate a firm diagnosis. Dr. Crespo offered no opinion with regard to Plaintiff's ability to work.
16. Plaintiff sought treatment with Dr. Allan Lieberman on June 21, 2006. Dr. Lieberman specializes in occupational and environmental medicine. After providing a substantial work history including prior employment with other companies that involved working with various chemicals, Plaintiff reported to Dr. Lieberman that he had experienced a chemical exposure at work on September 7, 2005, when he had cured approximately 90 pieces of fabric, more than he had ever done in one shift, at a higher than usual temperature. An unusual blue smoke had come from curing machine and the ventilation system was off that evening. Plaintiff reported coughing, chest pain, lightheadedness, a sore throat, and having to go outside *Page 7 
for fresh air. Plaintiff also reported that he had to seek medical treatment the next day and thereafter for continued symptoms.
17. As a result of this history and a physical examination, Dr. Lieberman diagnosed Plaintiff with toxic exposures that resulted in injury to multiple organs, manifesting as reactive airways dysfunction syndrome (RADS), palpitations in arrhythmia with the presence of an AV block, left ventricular hypertrophy, and neurotoxicity. Dr. Lieberman opined to a reasonable degree of medical probability that these conditions were directly related to Plaintiff's alleged exposure to chemicals on September 7, 2005. Dr. Lieberman also testified that the condition experienced by Plaintiff was not one to which the general public was equally exposed and that, to his knowledge, Plaintiff's last injurious exposure occurred on September 7, 2005. Dr. Lieberman opined that he did not believe anyone would hire Plaintiff now due to his RADS and his neurotoxicity, which causes cognitive difficulties. A one-month detoxification program was recommended.
18. Plaintiff testified that Dr. Crespo advised him that his test results had gotten better and that his AV block came from inhaling fumes. Plaintiff also testified that Dr. Lieberman had diagnosed him as being diabetic and that Dr. Khan told Plaintiff that he may have silicosis. This testimony was allowed by the Deputy Commissioner over hearsay objection, subject to corroboration, but said testimony was not corroborated. Plaintiff's testimony concerning what these physicians told him is stricken from the record for substantive purposes, but will be considered for the limited purpose of evaluating Plaintiff's overall credibility.
19. Dr. Allen Hayes is board-certified in internal and pulmonary medicine. He performed a review of Plaintiff's medical records and an independent medical evaluation (IME) of Plaintiff on November 15, 2006. Dr. Hayes administered several pulmonary and cardiac tests, *Page 8 
none of which revealed abnormal results other than an AV-1 block. Dr. Hayes testified that the AV-1 block was of doubtful clinical significance in Plaintiff's case. The pulmonary function tests administered to Plaintiff demonstrated poor effort. Dr. Hayes determined that Plaintiff had suffered a transient, acute airways hyper-irritability, such as one might experience after cleaning a dusty attic or mowing grass on a hot day. He did not believe there was any ongoing disease process for which Plaintiff needed medical treatment at the time of the IME. Dr. Hayes opined that Plaintiff had no respiratory limitation that would keep him from working. He also indicated disagreement with Dr. Lieberman's diagnosis of neurotoxicity, as well as the methods he used to arrive at that diagnosis.
20. Dr. Theron Blickenstaff is board-certified in general preventative medicine and occupational medicine. Dr. Blickenstaff has worked for many years as a toxicologist and consultant evaluating cases involving the inhalation of chemicals. He testified that he had been involved in direct patient care at different periods in time, amounting to about half of his 37-year career. Dr. Blickenstaff testified that there was no objective medical evidence that Plaintiff has a significant physical impairment and there was no convincing objective evidence that Plaintiff has RADS. Dr. Blickenstaff testified that Plaintiff underwent several pulmonary function tests, only one of which was a valid test, and it was normal. Dr. Blickenstaff agreed with Dr. Hayes's opinion regarding Plaintiff's submaximal effort on the pulmonary function testing and the validity of the results.
21. Dr. Blickenstaff explained that, throughout his medical treatment since the alleged exposure, Plaintiff had complained of symptoms, such as dyspnea, palpitation, memory loss, confusion, poor attention, imbalance, and light sensitivity, none of which equate to a disease. There was also no objective evidence in the medical records of Plaintiff having an arrhythmia. *Page 9 
The AV block seen on electrocardiogram was an incidental finding of no clinical significance. Furthermore, the particular chemicals that Plaintiff used on September 7, 2005, are relatively low in toxicity.
22. Greater weight is assigned to the testimony of Ms. Flood, Mr. Burgess, and Mr. Overman as to the events that transpired and the conditions present at Defendant-Employer's lab on September 7, 2005. The Full Commission does not give weight to Plaintiff's version of what occurred on September 7, 2005. Therefore, the greater weight of the evidence establishes that Plaintiff did not sustain an injury by accident arising out of or in the course of his employment with Defendant-Employer. He performed his usual and customary work on September 7, 2005, with no interruption in his work routine. The Full Commission also finds that Plaintiff did not contract an occupational disease associated with his employment with Defendant-Employer, as he was not exposed to the chemical "blue smoke" as alleged and was not placed at an increased risk for the development of any disease, as compared with members of the general public not so employed.
23. The Full Commission assigns greater weight to the testimony of Drs. Hayes, Khan, Masoud, Crespo, and Blickenstaff, as opposed to that of Dr. Lieberman, with respect to diagnosis, causation, and disability issues. Even though Dr. Lieberman's opinion supports Plaintiff's claim, his opinions are based largely on Plaintiff's recitation of the events and circumstances surrounding his alleged exposure at work.
24. Based upon the greater weight of the credible evidence, the Full Commission finds that Plaintiff failed to establish any disability relating to his alleged exposure on September 7, 2005.
 * * * * * * * * * * *Page 10 
Based upon the competent evidence of record, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff did not sustain a compensable injury by accident arising out of and in the course and scope of his employment with Defendant-Employer. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff does not suffer from a compensable occupational disease, nor was he at an increased risk as a result of his employment with Defendant-Employer, as compared with members of the general public not so employed, for the development of any medical condition from which he may suffer. Plaintiff was not last injuriously exposed to the hazards of any occupational disease while employed with Defendant-Employer. N.C. Gen. Stat. §§ 97-53, 97-57.
3. Plaintiff did not prove by the greater weight of the evidence any disability that resulted from any compensable occupational disease or injury by accident. N.C. Gen. Stat. § 97-2(9).
 * * * * * * * * * *
Based upon the foregoing Stipulations, Findings of Fact, and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Under the law, Plaintiff's claim must be, and hereby is, DENIED.
2. Each party shall bear its own costs.
 S/___________________ PAMELA T. YOUNG CHAIR
CONCURRING: *Page 11 
S/___________________ BERNADINE S. BALLANCE COMMISSIONER
S/___________________ DIANNE C. SELLERS COMMISSIONER *Page 1